IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| AMP'D MOBILE, INC., | ) | Case No. 07-10739 (BLS) |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| AMP'D MOBILE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adversary No. 08-50269 (BLS) |
| PETER ADDERTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| PETER ADDERTON, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MATTHEW NEWTON, PATRICK | ) | |
| DUNN, MARINUS N. HENNY, JON | ) | |
| AUERBACH, RAJEEV NARANG, | ) | |
| ALLEN BEASLEY, JOHN DONOVAN, | ) | |
| and EDWARD KINGMAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| | ) | |

## OPINION[1]

Before the Court is the motion to dismiss (the "Motion")

---

[1]    "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ."  Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[Docket No. 102] filed by third-party defendants Matthew Newton, Patrick Dunn, Jon Auerbach, Rajeev Narang, Allen Beasley, and John Donovan (hereinafter collectively referred to as the "Third-Party Defendants") seeking dismissal of the third-party complaint (the "Third-Party Complaint") filed against them by Peter Adderton, the sole defendant in this adversary proceeding (the "Defendant" or "Adderton").  The Motion has been joined by third-party defendants Marinus N. Henny and Edward Kingman [Docket No. 106].  For the following reasons, the Court will grant the Motion.

## I.  BACKGROUND

The plaintiff in this adversary proceeding, Amp'd Mobile, Inc. (the "Plaintiff" or "Amp'd"), formerly engaged in the business of operating a mobile phone and entertainment service that primarily targeted younger customers between the ages of eighteen and thirty.  Amp'd distinguished itself from its competitors by offering a broader range of media content for download onto their customer's mobile handsets than was generally available at the time, including music, games, video, and on-demand live streaming content.  Adderton was the founder of Amp'd, and also served as a director and the CEO of the company.

On May 2, 2007, Amp'd and Adderton entered into an employment and release agreement (the "Release Agreement") for the purpose of ending Adderton's tenure as CEO and transitioning

him to a different role with the company.  The Release Agreement provided Adderton with severance and incentive payments, a stock redemption agreement that called for Adderton to sell 100,000 of his nearly 1 million shares in Amp'd to the company for $7 per share, and other benefits.  The Release Agreement was subsequently approved by Amp'd's board of directors, with Adderton abstaining.  Adderton then stepped down as CEO, and the stock redemption proceeded under the terms of the Release Agreement.  On or about May 2, 2007, Adderton transferred 100,000 shares of stock to Amp'd, and received $700,000 in return. Adderton also subsequently received the severance payment contemplated by the Release Agreement.

Amp'd filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") on June 1, 2007, less than a month after Adderton stepped down as CEO.  Amp'd announced at the outset of its bankruptcy proceedings that its twin goals were to stabilize its relationships with certain critical service suppliers and to obtain financing sufficient to permit it to reorganize.  Amp'd was unable to obtain new financing and terminated services to its customers on August 2, 2007, after a brief but unsuccessful effort to sell itself as a going concern.

Amp'd commenced this adversary proceeding on February 1, 2008 by filing a complaint (the "Complaint") against Adderton, seeking disallowance of his claim and the avoidance and recovery

3

of several purportedly fraudulent transfers stemming from the Release Agreement.  Adderton filed an answer to the Complaint on March 18, 2008.  Amp'd then filed an amended complaint (the "Amended Complaint") on June 16, 2008.  In addition to the remedies originally sought, the Amended Complaint added new causes of action for preference liability and unjust enrichment, and also alleged that Adderton is liable under 8 Del. C. § 160 because Adderton redeemed his stock at a time when the Plaintiff's capital was impaired (the "Delaware Corporate Law Claim").

On June 25, 2008, Adderton filed an answer to the Amended Complaint.  Shortly thereafter, Adderton sought leave to amend his answer for the purpose of asserting claims against the directors of Amp'd who authorized the stock redemption that served as the basis for the Delaware Corporate Law Claim. Adderton contended that, under 8 Del. C. § 174, he would be entitled to contribution from these directors if Amp'd is ultimately successful in asserting the Delaware Corporate Law Claim against him.

Amp'd responded on September 19, 2008 by seeking leave to dismiss its Delaware Corporate Law Claim.  At that time, Amp'd also opposed Adderton's motion for leave to file his Third-Party Complaint.  One week later, the Defendant filed an opposition to Amp'd's motion for leave to dismiss, contending that he would

4

suffer "plain legal prejudice" if Amp'd were permitted to dismiss the Delaware Corporate Law Claim.  More specifically, Adderton argued that dismissal of that claim would deprive him of his claim for contribution against Amp'd's directors, making dismissal improper under Federal Rule of Civil Procedure 41(a)(2).

Following oral argument on Amp'd's motion for leave to dismiss the Delaware Corporate Law Claim and Adderton's motion for leave to file his Third-Party Complaint, the Court issued a written opinion [Docket No. 87] denying Amp'd's motion and granting Adderton's motion on October 24, 2008.  The Court's opinion noted that it was not clear if there was any meaningful prospect for recovery by Adderton on the contribution claims advanced by him in what is now the Third-Party Complaint, but nevertheless concluded that it was not appropriate to foreclose this possibility in the context of the motions before the Court at that time.  (Opinion at 7-8.)

Following the Court's opinion, Adderton filed the Third-Party Complaint on November 7, 2008.  It asserts three causes of action against the Third-Party Defendants: (i) a claim for equitable contribution and subrogation; (ii) a claim for statutory contribution under 8 Del. C. § 174(b); and (iii) a claim for declaratory relief.

The Third-Party Defendants filed the instant Motion on

January 16, 2009.  The Motion contends that a general release of claims, contained in the Release Agreement signed by Adderton, bars each of Adderton's claims against the Third-Party Defendants.  The Motion also claims that (i) Delaware does not recognize equitable contribution or equitable subordination as causes of action; (ii) Adderton has no statutory right to contribution from the Third-Party Defendants; and (iii) that Adderton's declaratory relief claim is simply duplicative of his other claims.  In response, Adderton challenges the enforceability of the general release in the Release Agreement, and makes a number of legal arguments in support of his particular claims.

This matter has been fully briefed and is ripe for decision.

## II. <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H) and (O).

## III. <u>STANDARD OF REVIEW</u>

The Third-Party Defendants seek dismissal of all three counts in the Third-Party Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides for dismissal for "failure to state a claim upon which relief can be

6

granted."

The courts determined long ago that a motion to dismiss pursuant to 12(b)(6) "tests the sufficiency of the allegations contained in the complaint." Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). For nearly 50 years, courts applied a liberal standard when determining whether the factual allegations made in a complaint were sufficient to withstand a 12(b)(6) motion. Taking their cue from the Supreme Court's ruling in Conley v. Gibson, 355 U.S. 41 (1957), most courts found that a count in a complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46.

A recent United States Supreme Court case, however, altered the analysis courts apply under 12(b)(6). In Bell Atlantic v. Twombly, 127 S.Ct. 1955 (2007), the Court did away with this "no set of facts" standard, stating in no uncertain terms that this language "has earned its retirement." Twombly, 127 S.Ct. at 1969. In fact, the Court inferred that this language had been improperly applied all along by stating that it "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id.

7

The _Twombly_ Court also explained that a plaintiff must
"nudge [his or her] claims across the line from conceivable to
plausible" in order to survive a motion to dismiss.  _Twombly_, 127
S.Ct. at 1974.  This language has been read as imposing a new
"plausibility" requirement at the pleading stage of all cases by
a number of courts, including the U.S. Court of Appeals for the
Third Circuit.  See _Phillips v. County of Allegheny_, 515 F.3d
224, 234 ("[W]e decline at this point to read _Twombly_ so narrowly
as to limit its holding on plausibility to the antitrust
context.").

The Third Circuit has explained that this plausibility
requirement "is related to the requirement of a Rule 8
'showing.'" _Id._  According to the Third Circuit, "a 'showing'
requires only notice of a claim and its grounds," and the _Twombly_
Court "distinguished such a showing from 'a pleader's "bare
averment that he wants relief and is entitled to it."'" _Id._
(citing _Twombly_, 127 S.Ct. at 1965 n. 3).  Thus, the Third
Circuit has concluded that "Rule 12(b)(6) does not permit
dismissal of a well-pleaded complaint simply because 'it strikes
a savvy judge that actual proof of those facts is improbable,'
[but] the '[f]actual allegations must be enough to raise a right
to relief above the speculative level.'" _Id._ (citing _Twombly_, 127
S.Ct. at 1965).

As noted by the Third Circuit in _Phillips_, however, the

8

Supreme Court appears to have left the remainder of 12(b)(6)
jurisprudence intact.  Twombly reaffirmed that Federal Rule of
Civil Procedure 8 " 'requires only a short and plain statement of
the claim showing that the pleader is entitled to relief,' in
order to 'give the defendant fair notice of what the ... claim is
and the grounds upon which it rests,' " and that this standard
does not require "detailed factual allegations."  Twombly, 127
S.Ct. at 1964.  Twombly "also reaffirmed that, on a Rule 12(b)(6)
motion, the facts alleged must be taken as true and a complaint
may not be dismissed merely because it appears unlikely that the
plaintiff can prove those facts or will ultimately prevail on the
merits."  Phillips, 515 F.3d at 231 (citing Twombly, 127 S.Ct. at
1964-65, 1969 n. 8).  Additionally, while Twombly did not address
whether all reasonable inferences should continue to be drawn in
favor of plaintiffs subjected to 12(b)(6) motions, the Third
Circuit has held that nothing in Twombly changes this long-
established practice.  Id.  Moreover, it should be noted that the
Twombly Court repeatedly stressed that it was neither demanding a
heightened pleading of specifics, nor imposing a "probability
requirement."  Twombly, 127 S.Ct. at 1964-65, 1969 n. 8.

    The Third Circuit has summarized the Twombly Court's
formulation of the pleading standard as follows:

> "[S]tating ... a claim requires a complaint
> with enough factual matter (taken as true) to
> suggest" the required element.  This "does

> not impose a probability requirement at the
> pleading stage," but instead "simply calls
> for enough facts to raise a reasonable
> expectation that discovery will reveal
> evidence of" the necessary element.

Phillips, 515 F.3d at 234 (internal citations omitted).  This

standard will, of course, govern the Motion in this case.

## IV.  DISCUSSION

As a threshold matter, the Court notes that it may consider

exhibits attached to a complaint whose authenticity is unquestioned

when considering a motion to dismiss.  See Pension Benefit Guar.

Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1195 (3d Cir.

1993) (noting that a court considering a motion to dismiss may

consider "allegations contained in the complaint, exhibits attached

to the complaint and matters of public record").  In this case, a

copy of the Release Agreement executed by Amp'd and Adderton is

attached as Exhibit 1 to Adderton's Third-Party Complaint.

Accordingly, the Court can consider this document, which by its

terms is governed by California law, in evaluating whether the

Third-Party Complaint should be dismissed.

With this in mind, the Court turns to the question of whether

the Release Agreement bars Adderton from asserting his claims for

statutory  contribution  and  equitable  contribution  and/or

10

subordination.[2]    The Release Agreement executed by Adderton provides Amp'd and "its current and former officers, directors, employees, agents, investors, attorneys, shareholders, administrators, affiliates, divisions, and subsidiaries, and predecessor and successor corporations and assigns" with a general release that is broadly written. (Release Agreement at ¶ 5). The release covers "any claim, complaint, charge, duty, obligation, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected" that Adderton may possess against the parties released under the agreement "arising from any omission, acts, facts, or damages that have occurred up until and including the Effective Date" of the Release Agreement. (Id.).[3] Under the terms of the Release Agreement, the "Effective Date" of the Release Agreement was the eighth day after Adderton signed it. (Id. at ¶ 12). Adderton signed the Release Agreement on May 2, 2007, so the "Effective Date" was May 10,

---

[2]    There is a dispute between the parties over whether Delaware law recognizes claims for equitable contribution and equitable subordination. The Court assumes, solely for sake of argument, that Delaware law would recognize such claims on the terms advanced by Adderton in his briefs.

[3]    The Release Agreement also provides for release of a number of more specific claims, without limitation as to the effectiveness of the general release. These include any and all claims relating to or arising from Adderton's relinquishment of his role as CEO of Amp'd, and any claim for attorney's fees and costs. (Id. at ¶ 12).

2007.[4]  The effect of this is that Adderton gave the Third-Party Defendants and other releasees a complete and general release of all claims he had against them based on anything they did or failed to do prior to midnight on May 10, 2007.

Because Adderton redeemed his stock and received consideration for the redemption on May 2, 2007, any contribution or subrogation claim arising from this stock redemption would have arisen before the "Effective Date" of the Release Agreement, and thus would be within the temporal scope of the release.[5]

The question thus becomes whether Adderton's claims against the Third-Party Defendants are precluded under the terms of the Release Agreement.  Although Adderton argues otherwise, the Court finds that the Release Agreement is not ambiguous or "reasonably susceptible" to multiple interpretations.  See Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., 442 69 Cal. 2d 33, 37 (1968) (holding that, under California law, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be

---

[4]    The Third-Party Complaint alleges that the Release Agreement was executed on or about May 4, 2007.  The copy of the Release Agreement attached to the Third-Party Complaint clearly shows that it was signed and dated on May 2, 2007, however.  In any event, though, whether the Agreement was executed on May 2 or May 4 does not bear upon the outcome of the Court's ruling.

[5]    Severance payments made to Adderton after this date, however, are not within the scope of the Release Agreement or this Opinion.

12

plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible"). The clear language of the release provides a complete, general release in favor of the Third-Party Defendants and others that includes contribution and subrogation claims. The only limitations on the release are "claims that cannot be released as a matter of law" and "obligations incurred under" the Release Agreement itself. The law does not prevent the release of the type of claims asserted by Adderton, and Adderton's claims for contribution and subrogation were not incurred by Amp'd under the Release Agreement.[6] The Release Agreement, if enforced as written, would clearly prohibit Adderton from bringing these claims.

Adderton argues in the alternative that the instant Release Agreement will not be supported by consideration if Amp'd is successful in recovering the consideration paid to Adderton under the terms of the Release Agreement in this lawsuit. See, e.g., Holcomb v. Long Beach Inv. Co., 129 Cal. App. 285, 296-97 (1933) (noting California law requires consideration to make a written release enforceable). In the present dispute, there are five

---

[6]    Putting aside the issue of whether the Third-Party Defendants could incur an enforceable obligation under the Release Agreement when they were not parties to it, the Court concludes that claims for contribution and subordination such as Adderton's would arise as a matter of law, not under a contract such as the Release Agreement executed in this case.

ways Amp'd could recover from Adderton.  Whether Adderton will
retain consideration after a successful recovery by Amp'd depends
on which of these causes of action Amp'd recovers on.  But, as
demonstrated below, any recovery based on the causes of action
asserted in Amp'd's Amended Complaint arising from Adderton's
stock redemption will result in either (i) Adderton retaining
consideration such that the Release Agreement is enforceable, or
(ii) Amp'd recovering on a theory that, as a matter of law, does
not allow for a consequent contribution or subordination claim.

     First, if Amp'd recovers from Adderton on one of the several
fraudulent conveyance theories advanced in the Amended Complaint,
Amp'd will have effected a rescission of the Release Agreement.
See Grace v. Bank Leumi Trust Co., 443 F.3d 180, 189 (2d Cir.
2006), cert. denied, 549 U.S. 1114 (2007) ("[t]he proper remedy
in a fraudulent conveyance claim is to rescind, or set aside, the
allegedly fraudulent transfer, and cause the transferee to return
the transferred property to the transferor.").  After such a
recovery, Adderton would be correct to argue that there is no
consideration to support the release he signed – in fact, there
would have already ceased to be such a release because it would
have been rescinded.  But, if Amp'd recovers through this method,
Adderton could not assert a claim for contribution or subrogation
against the Third-Party Defendants because there is no damage

award to get contribution toward,[7] and because one cannot be
subrogated to a recovery resulting from such a rescission.  Thus,
there can be no contribution or subordination claim, equitable or
statutory, following recovery on a fraudulent conveyance claim.

Second, there can be no contribution or subordination right
resulting from a recovery by Amp'd in the form of a disallowance
of claim.  If Adderton's claim is disallowed, there is no
monetary judgment another can be forced to contribute toward, or
subrogated to recover from another.  Moreover, if Amp'd's only
successful cause of action against Adderton is for disallowance
of a claim, then Adderton will have retained consideration under
the Release Agreement and the general release would preclude

---

[7]     Though some authorities may speak colloquially of
recovering "damages" for a fraudulent transfer, such a
description is inaccurate.  As noted recently by the United
States Court of Appeals for the Second Circuit, a creditor's
remedies in a fraudulent conveyance action are "limited to
reaching the property which would have been available to satisfy
the [debtor's obligations] had there been no conveyance, and
requiring that it be restored to the debtor's possession."
Grace, 443 F.3d at 189 (quoting Geren v. Quantum Chem. Corp., 832
F.Supp. 728, 736-37 (S.D.N.Y. 1993).  Or, put another way, the
"purpose of such an action is to force the debtor to recover
property transferred for inadequate consideration so that the
property can be used to satisfy the debt owed to the creditor."
Id.  At bottom, recovering a fraudulent transfer simply gives the
debtor its property back (or, in some cases, the value of that
property).  The fact that the recovered property may sometimes be
money, as here, does not transmute the recovery into an award of
money damages.  Once an agreement to transfer money or other
property is rescinded on the grounds that it constitutes a
fraudulent transfer, the property or money to be recovered ceases
to belong to the returning transferee; it becomes the debtor's
property once again.  Having one's own property returned is
fundamentally different than receiving a damages award.

Adderton from asserting any contribution or subordination claim against the Third-Party Defendants.

Third, a recovery based on an unjust enrichment theory could, theoretically, dispossess Adderton of all consideration received under the Release Agreement. This would render the general release signed by him null and void, and thus allow him to assert a contribution claim against others who were also unjustly enriched by the act that unjustly enriched Adderton (or, if Adderton was secondarily unjustly enriched and another person was primarily unjustly enriched, a subrogation claim). The facts pled by Adderton in the Third-Party Complaint, however, foreclose any such possibility in this case. Taken as true, the allegations in the Third-Party Complaint show that Adderton was the only party who could conceivably be found to have been unjustly enriched under the Release Agreement. Therefore, no contribution or subrogation claim can arise if Amp'd recovers from Adderton on an unjust enrichment theory.

Fourth, if Amp'd recovered from Adderton on a preference theory, then Adderton still will have retained sufficient consideration under the Release Agreement for the release to be enforceable and bar any contribution or subrogation claim against the Third-Party Defendants. This is the case because, in addition to other consideration Adderton may have received and kept under the Release Agreement, a transferee from whom a

16

preferential payment is recovered is entitled to file a claim
arising from the recovery pursuant to section 502(h) of the Code.
See In re Enron Creditors Recovery Corp., 376 B.R. 442, 466
(Bankr. S.D.N.Y. 2007).  Put another way, if Amp'd recovers from
Adderton on a preferential transfer theory, Adderton will be
entitled to prosecute claims against Amp'd on account of the
avoided transfer.  Therefore, Adderton will still retain
consideration under the Release Agreement, and as a result there
would not be a failure of consideration that invalidates the
release.

     Finally, Adderton cannot bring a contribution or
subordination claim, either equitable or statutory, based on the
Delaware Corporate Law Claim.  Adderton received consideration
under the Release Agreement apart from the consideration given to
him for his stock redemption (and apart from that which Amp'd
seeks to recover from Adderton in this litigation).  Therefore,
if Amp'd succeeds against Adderton on the basis of the Delaware
Corporate Law Claim, there will still be consideration for the
general release, and the general release will bar Adderton's
contribution claims.  Moreover, if it is shown that Adderton had
knowledge that his redemption was unlawful at the time he
received payment, then he is primarily liable to the directors,
who are subordinated to the rights of Amp'd to recover the
proceeds of the improper redemption from Adderton, and

17

contribution becomes a moot point.  See 8 Del. C. § 174(c)
(requiring "knowledge of facts indicating that such dividend,
stock purchase or redemption was unlawful" in order for
shareholder receiving such to be liable to either the corporation
or, derivatively, the directors who authorized the transaction
and recompensed the corporation for the loss).  This is because
the Directors who would have to pay Adderton in contribution
would be allowed to recover anything paid to him in contribution
from Adderton after being subrogated to the rights of the
corporation against Adderton.  These amounts would be setoff
against each other and Adderton would receive nothing.[8]

---

[8]     This very curious situation results because of
Adderton's role as both a director and a redeeming shareholder of
Amp'd.  Section 174 makes any director who willfully or
negligently authorizes an improper redemption jointly and
severally liable to the corporation, and to its creditors in the
event of its dissolution or insolvency, to the full amount
unlawfully paid for the redemption of the corporation's stock.  8
Del. C. § 174(a).  As noted by Adderton, however, section 174(b)
provides that "[a]ny director against whom a claim is
successfully asserted under this section shall be entitled to
contribution from the other directors who voted for or concurred
in the unlawful ... stock redemption."  8 Del. C. § 174(b).

   Section 174(c), meanwhile, provides that:

   [a]ny director against whom a claim is successfully
   asserted under this section shall be entitled, to the
   extent of the amount paid by such director as a result
   of such claim, to be subrogated to the rights of the
   corporation against stockholders who received the
   [consideration for the redemption of their stock] with
   knowledge of facts indicating that such [stock
   redemption] was unlawful under this chapter, in
   proportion to the amounts received by such stockholders
   respectively.

18

The Court also notes that Amp'd previously moved for leave to dismiss the underlying Delaware Corporate Law Claim, which motion the Court denied without prejudice in order to explore Adderton's contribution claims on the merits.  Now, with Adderton having had the opportunity to at least plead his contribution claims, and the Court having considered the matter on a more fully developed record, the Court deems dismissal of the Delaware Corporate Law Claim appropriate at this time.

To recap, if Amp'd recovers from Adderton, one of two situations will result: either (i) the remedy awarded to Amp'd will not allow Adderton to assert a claim for contribution as a matter of law because there can be no contribution toward such a remedy, or (ii) in each instance where a contribution claim would otherwise be permitted, the contribution claim will be barred in this instance by the Release Agreement.  Accordingly, there is no possible recovery by Amp'd in this case that would allow Adderton to assert a claim for contribution or subordination against the Third-Party Defendants based on the facts pled in the Third-Party Complaint and the causes of action pled by Amp'd.  Therefore,

---

8 Del. C. § 174(c).  Clearly, any contribution paid by the Third-Party Defendants to Adderton would be "amount paid by such director as a result of" a contribution claim, and thus would be subrogated to the rights of the corporation to recover from Adderton if, as noted above, Adderton had knowledge that his redemption was unlawful.  The law of setoff would make such contribution a futile exercise.

19

Adderton's claim for statutory contribution under 8 Del. C. § 174 and his claim for equitable contribution and/or equitable subrogation both fail to state a claim for relief that can be granted and are hereby dismissed.[9]

### V.    CONCLUSION

For the foregoing reasons, the Court finds that Adderton's claims against the Third-Party Defendants are precluded by the Release Agreement.  Accordingly, the Court will grant the Motion.

An appropriate order follows.

By the Court,

Dated: April 16, 2009

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[9]    Adderton also seeks a "judicial determination of his rights and obligations, and a declaration that the [Third-Party Defendants] are liable in contribution and/or subrogation for the amount of any judgment against Adderton related to the Stock Redemption."  The Court views this declaratory relief claim as wholly duplicative of Adderton's first two claims and finds dismissal is therefore warranted.  See In re Am. Bus. Fin. Serv., Inc., 362 B.R. 149, 166 (Bankr. D. Del. 2007).